UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CANTATA TECHNOLOGY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Eastern Division |
| v. | ) | Civil Action No. 08-cv-11371-PBS |
| | ) | |
| INTERMETRO COMMUNICATIONS, INC. | ) | |
| | ) | |
| Defendant, Plaintiff-in-Counterclaim | ) | |
| and Third-Party Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| DIALOGIC CORPORATION, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

## CANTATA TECHNOLOGY, INC.'S AND DIALOGIC CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF THEIR
## MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56(c), Plaintiff and Defendant-in-Counterclaim Cantata Technology,

Inc. ("Cantata") and Third-Party Defendant Dialogic Corporation ("Dialogic") submit this

memorandum of law in support of their Motion for Summary Judgment.

## INTRODUCTION

The essential, undisputed facts are quite straightforward.[1]    Plaintiff and defendant-in-

counterclaim Cantata is a Massachusetts corporation which supplies communications hardware and

software products. SOF ¶ 1.    Defendant and plaintiff-in-counterclaim InterMetro is a Delaware

corporation which owns and operates a nationwide voice-over internet protocol ("VoIP") network

infrastructure, providing to its customers enhanced voice and data communications services. Id. ¶ 3.

Third-party defendant Dialogic is a corporation having a principal place of business in Montreal,

Quebec, Canada. Id. ¶ 2.    In October 2007, Dialogic acquired the parent company of Cantata, though

Cantata continues to have independent legal existence as a separately-named Massachusetts corporation,

---

[1] A detailed description of the facts in this case is contained in Cantata and Dialogic's Local Rule 56.1 Statement of Undisputed Facts (submitted herewith and referenced throughout as "SOF ¶ __").

which is a subsidiary of Dialogic. Id.  Dialogic's acquisition of Cantata postdates all of the relevant

contractual dealings between Cantata and InterMetro. Id. ¶¶ 108-109.

On May 2, 2006, after several months of negotiations, Cantata and InterMetro entered into a

valid and binding contract known as the "Strategic Agreement." Id. ¶¶ 11-12.  The Strategic Agreement

set out the parties' agreement regarding the sale of Cantata integrated media gateways ("IMGs")[2] and

servers known as serial line multiplexers ('SLMs') (collectively, the "Equipment"), along with related

support services, for use in InterMetro's expanding telecommunications network. Id. ¶¶ 1, 11, 18.  In the

Strategic Agreement, Cantata and InterMetro agreed upon a price of $29,950 USD for each IMG, a

price of $2,950 USD for each SLM, and a price of $2,100 USD per IMG for one year of support

services provided by Cantata to InterMetro. Id. ¶ 20.

In late May and early June 2006, Cantata fulfilled its obligations under the Strategic Agreement

by delivering the Equipment (30 IMGs and 4 SLMs ). Id. ¶ 26.  InterMetro has admitted that the total

price for the Equipment was $910,300, plus applicable sales tax, and that it paid nothing up front for the

Equipment.  Id. ¶¶ 27, 32.  Cantata also began performing on the one-year support plan by assisting

InterMetro with the installation of the IMGs and SLMs in June 2006, and then by responding to any

assistance requests that arose as InterMetro began passing minutes of communications traffic through

the Cantata IMGs, beginning in August 2006. Id. ¶¶ 56-59.  InterMetro has admitted that the total price

for the one-year support plan on the Equipment was $63,000, and that it never paid for the support

services it received. Id. ¶¶ 27, 33.

In lieu of an up-front cash payment, the parties agreed that InterMetro could purchase the

Equipment and associated support services pursuant to the "revenue purchase option" contained in the

---

[2] An IMG is a machine which allows for the conversion of a phone call from the voice-based public switch telephone
network to an Internet Protocol format. SOF ¶ 4.  Both the content of the call (*i.e.*, what is being said) and the routing of
the call (*i.e.*, where the call needs to go) can then be moved digitally within the internet protocol framework until
another gateway converts them back to the end user on another public switch telephone network, thus "completing" the
call. Id.

Strategic Agreement. Id. ¶¶ 16, 28. Under this option, the cost of the Equipment and associated support services would be paid for by InterMetro on a monthly basis, with the monthly payments calculated as a fraction of the monthly revenues InterMetro generated from minutes per month passed over each IMG. Id. These payments were subject to two conditions: first, if the fractional monthly revenue generated by an IMG was less than $600, then Cantata could require InterMetro to pay a $600 monthly minimum per machine (which translates to an $18,000 monthly minimum for all 30 IMGs combined); and second, irrespective of monthly payments made, the full purchase price of the support plan was to come due one year from delivery of the Equipment, and the full purchase price of the Equipment was to come due two years from delivery. Id. ¶ 29.

InterMetro breached the Strategic Agreement with Cantata in various ways, including its failure to provide monthly reports of the traffic flowing over the IMGs and to make related monthly payments to Cantata. Id. ¶ 61. However, for purposes of this motion the most significant breach is that InterMetro has not paid the full purchase price for the Equipment and associated services, which is now long overdue. InterMetro has made a grand total of $29,215 in payments to Cantata (less than the cost of one IMG), a far cry from the more than one million dollars that it owes Cantata under the terms of the Strategic Agreement. Id. ¶ 35.

InterMetro does not contest that it breached the Strategic Agreement. Indeed, InterMetro expressly stated in its 2008 Annual Report that as of December 31, 2008 it had accrued $1,096,000 in payments due to Cantata. Id. ¶ 36. All the more remarkable is the fact that for more than three years InterMetro used and profited from the Cantata Equipment, some of which even now remains in InterMetro's network. Id. ¶¶ 104. Had InterMetro found the Equipment in any way unsatisfactory or unsuitable for its desired purposes (as it now claims), InterMetro could have taken advantage of the one-year express warranty that had been provided by Cantata in the Strategic Agreement. Id. ¶¶ 21-23. Yet the uncontested fact is that InterMetro did not do so. Id. ¶ 98. The existence of the express warranty in

the Strategic Agreement, and InterMetro's failure to make use of it, are ultimately fatal not only to InterMetro's defenses to Cantata's contract claims, but also to InterMetro's counterclaims against Cantata.

## PROCEDURAL BACKGROUND

On August 12, 2008, Cantata filed a complaint[3] against InterMetro arising out of InterMetro's breach of the May 2, 2006 Strategic Agreement between Cantata and InterMetro. On September 25, 2008, InterMetro answered Cantata's complaint and further asserted counterclaims[4] against Cantata. InterMetro also asserted third-party claims against Dialogic.[5]

## ARGUMENT

A.    STANDARD OF REVIEW -- INTERMETRO CANNOT ESCAPE SUMMARY JUDGMENT BY RELYING ON UNREASONABLE INFERENCES AND MERE CONJECTURE.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Carroll v. Xerox Corp., 294 F.3d 231, 236 (1st Cir. 2002) (citing Fed. R. Civ. P. 56(c)). Neither "conclusory allegations" nor "improbable inferences" made by the non-movant are sufficient to defeat summary judgment. Sensing v. Outback Steakhouse of Florida, 575 F.3d 145, 152-53 (1st Cir. 2009) (citing Carroll, 294 F.3d at 236-37). Rather, the non-movant's allegations with respect to any factual dispute "must herald the existence of 'definite, competent evidence' fortifying the [non-movant's] version of the truth." Vega v. Kodak Caribbean, Ltd., 3 F.3d 476, 479 (1st Cir. 1993) (quoting Mesnick v. General Elec. Co., 950

---

[3]  Cantata's complaint asserted claims for (1) breach of contract (Count I), (2) breach of the covenant of good faith and fair dealing (Count II), and (3) unjust enrichment (Count III). Complaint ("Compl.") ¶¶ 39-55.
[4]  InterMetro's counterclaims included (1) fraudulent misrepresentation (Count I), (2) breach of contract (Count II), (3) breach of warranty (Count III), (4) violation of Chapter 93A (Count IV), and (5) quantum meruit (Count V). Counterclaim ("Countercl.") ¶¶ 9-20. As Cantata's claims and InterMetro's counterclaims all relate to the Strategic Agreement, they will be analyzed in this memorandum together.
[5]  InterMetro's claims against Dialogic include (1) tortious interference with the Strategic Agreement (Count I), and (2) violation of Chapter 93A (Count II). Third-Party Complaint ("3PC") ¶¶ 8-12. Given the fact that Dialogic acquired Cantata in October 2007, and had nothing whatsoever to do with the May 2, 2006 Strategic Agreement between Cantata and InterMetro, these third-party claims will be analyzed separately in this memorandum.

F.2d 816, 822 (1st Cir. 1991)).

In this case, the clear, undisputed evidence is that a Strategic Agreement was signed, that InterMetro purchased the Equipment and associated support plans under the Strategic Agreement, and that InterMetro then failed to pay Cantata for the same. Indeed InterMetro admits that this is the case, both in its responses to Cantata's discovery requests as well as in its own public filings with the SEC. SOF ¶¶ 26, 30, 32-33, 35-36. In contrast, InterMetro has proffered no competent evidence supporting its defense that an alleged misrepresentation excuses its breach of the Strategic Agreement. Even considering the record in the light most favorable to InterMetro and indulging all reasonable inferences in its favor, InterMetro's "evidence" supporting its defenses, counterclaims, and third-party claims boils down to nothing more than "[o]ptimistic conjecture," "unbridled speculation," and "hopeful surmise," Vega, 3 F.3d at 479, none of which are sufficient for it to survive summary judgment under the straightforward facts of this case.

**B.    CANTATA IS ENTITLED TO SUMMARY JUDGMENT ON BOTH CANTATA'S CLAIMS AGAINST INTERMETRO AND INTERMETRO'S COUNTERCLAIMS AGAINST CANTATA.**

As set forth above, InterMetro's admissions alone support the entry of summary judgment in favor of Cantata on all the counts of its complaint, including breach of contract, breach of the covenant of good faith and fair dealing, and unjust enrichment.[6]

InterMetro is thus left to stand on the counts contained within its counterclaim against Cantata, which are styled as defenses to and/or justifications for InterMetro's admitted breach of contract. InterMetro's primary defense is a claim for fraudulent misrepresentation. InterMetro alleges that prior to the May 2, 2006 Strategic Agreement it had made known to Cantata its "need to have equipment that

---

[6] Cantata's good faith and fair dealing claim (Count II) is largely derivative of its breach of contract claim. See Compl. ¶¶ 46-50. Thus, to the extent this Court finds that summary judgment should enter in favor of Cantata on its contract claim, so too should summary judgment enter on its good faith and fair dealing claim. Similarly, Cantata's unjust enrichment claim (Count III) stems from the fact that Cantata provided, and InterMetro accepted, numerous replacement parts and components pursuant to the one-year support plan, and yet InterMetro failed to return to Cantata many of the parts and components which were replaced, as it was required to do. See id. ¶¶ 51-55. Summary judgment should also be granted in favor of Cantata on this claim because InterMetro breached its obligation to pay for the support plan under the Strategic Agreement.

would enable InterMetro's system to bridge the gap between a public switch telephone network and an Internet protocol enhanced services network," and that Cantata had represented to InterMetro that it "could supply equipment and related services that were fit for the particular uses presented by InterMetro and that the equipment that it would be providing were 'carrier-grade.'" Countercl. ¶ 3. InterMetro further alleges that "Cantata provided equipment and software, including IMGs, that were not of carrier-grade quality," and that "Cantata otherwise provided equipment and software that failed to operate properly and to conform to the particular needs of InterMetro as agreed upon by the parties." Id. ¶ 6.

InterMetro's counterclaim must fail.  InterMetro cannot rest on bare allegations in support of its fraudulent misrepresentation claim, but rather must adduce sufficient evidence (1) that Cantata made a false representation of a material fact with knowledge of its falsity for the purpose of inducing InterMetro to act thereon, (2) that InterMetro relied upon the representation as true and acted upon it to its detriment, and (3) that InterMetro's reliance was reasonable under the circumstances.  Rodi v. Southern New England School of Law, 532 F.3d 11, 15 (1st Cir. 2008) (citing Masingill v. EMC Corp., 449 Mass. 532, 540-41 (2007)).  InterMetro cannot prove any of these elements through competent evidence.  Furthermore, although the question of whether a party's reliance was reasonable is often a question of fact for the jury, that is by no means an absolute rule.  "[I]f no reasonable jury could find the party's reliance reasonable," the First Circuit has recently made clear, "a court may grant summary judgment."  Id.; see also id. at 18 ("[I]t is settled law that the reasonableness of a party's reliance is not necessarily a jury question.").  Here, no reasonable jury could find that InterMetro reasonably relied on the misrepresentations allegedly made by Cantata.  Therefore, Cantata is entitled to summary judgment.

### 1.    Cantata did not a make a false representation of material fact to InterMetro.

InterMetro alleges that it relied on Cantata's representations that its IMGs were of "carrier grade" quality. Countercl. ¶¶ 3-4, 6.   Yet the record is clear that Cantata never made any such

representations to InterMetro.  Cantata and InterMetro entered into a fully negotiated and fully integrated written Strategic Agreement for the sale of IMGs on May 2, 2006. SOF ¶¶ 12-15.  Although InterMetro provided the initial draft of the Strategic Agreement and was represented by counsel throughout the agreement's negotiation and drafting, id. ¶ 13, nowhere in it is there any representation or warranty that the IMGs would be "carrier grade."  In fact, the term "carrier grade" appears nowhere in the Strategic Agreement.  Furthermore, there is no representation that the IMGs would be "carrier grade" in any of the written materials evidencing negotiations between InterMetro and Cantata prior to May 2, 2006.  For example, in March 2006, Cantata put together a PowerPoint presentation that was discussed with InterMetro in April. Id. ¶ 41.  The Cantata presentation was responsive to InterMetro's request for proposals ("RFP") regarding integrated media gateways. Id.  Cantata's presentation did not represent that its IMGs were "carrier grade"; indeed, InterMetro's own RFP did not make use of the term "carrier grade," let alone require that Cantata's Equipment be "carrier grade." Id. ¶ 42.  Moreover, in April 2006, prior to the parties' execution of the contract, the companies' chief technology officers and others met to discuss the specifications for and limitations of the IMGs, and InterMetro proposed and signed the Strategic Agreement with Cantata nonetheless. Id. ¶¶ 9, 25.  The only record evidence even of any oral representations made by Cantata is the self-serving affidavit of Jon DeOng, which is not supported by any contemporaneous evidence.  Docket No. 37, at ¶ 2.[7]  Moreover, the Strategic Agreement was a fully integrated contract, which constituted "the complete and exclusive statement of the Agreement between the parties" and superseded "all prior agreements and communications with respect to the subject matter." SOF ¶ 15.  Therefore, any alleged oral representations that the Equipment would be "carrier grade," of which InterMetro has proffered no evidence, were superseded when InterMetro signed the Strategic Agreement with Cantata, which contained no such term.

---

[7] Ironically, in this same affidavit dated April 15, 2009, Mr. DeOng states that if InterMetro had returned the Equipment, it "would have effectively put InterMetro out of business altogether," and that it would be "irreparably harmed if it is ordered to immediately remove and return the remaining" Cantata Equipment in its network. Docket No. 37, at ¶¶ 10-11.

If this were not enough, the Strategic Agreement specifically disclaimed all implied or unexpressed warranties, including a warranty of fitness for a particular purpose. Id. ¶ 23. InterMetro cannot now attempt to rely on a representation or warranty that was never expressed in, and was specifically disclaimed by, the Strategic Agreement. Otherwise, "the language of the contract simply would not matter any more." Masingill, 449 Mass. at 542 (quoting McEvoy Travel Bur., Inc. v. Norton Co., 408 Mass. 704, 710-11 (1990)). InterMetro was obviously not particularly concerned about the vague notion that the Equipment be "carrier grade," or it would have made sure that this specification existed as an express condition of the contract it drafted.

Moreover, InterMetro has failed to proffer any evidence that if Cantata did make any such representations, it did so with knowledge of their falsity, which is a necessary element of InterMetro's misrepresentation claim. See Rodi, 532 F.3d at 15. InterMetro has admitted both that it was aware of an independent study that Cantata conducted on its Equipment in August 2005 (which concluded that the Equipment was carrier grade), and that it has no evidence suggesting that Cantata knew its Equipment was not carrier grade when the parties entered into the Strategic Agreement in May 2006. SOF ¶¶ 38-40.

Ironically, while InterMetro's defense and counterclaims rest on the allegation that the IMGs were misrepresented to be "carrier grade," InterMetro's 2007 annual report, which was signed by CEO Charles Rice and filed with the SEC in April 2008, stated that InterMetro's VoIP network "utilizes proprietary software, configurations and process, advanced Internet Protocol, or IP, switching equipment and fiber-optic lines to deliver carrier-quality VoIP services that can be substituted transparently for traditional long-distance services." Id. ¶ 43 (emphasis added). InterMetro also represented to investors and to the SEC that Cantata's Equipment was "state-of-the-art." Id. ¶¶ 43-44. If InterMetro did not believe that the Cantata IMGs were state of the art or carrier grade by April 2008 (which was more than a year and a half after getting the IMGs up and running in its network), then it

should not have represented to the SEC, its investors, and the public that its entire network, including the IMGs that facilitated parts of this network, was carrier-quality.[8]

**2.    InterMetro has failed to show that it relied on Cantata's representations to its detriment.**

Even if InterMetro could show that Cantata made misrepresentations with respect to the IMGs that were part of the Strategic Agreement, InterMetro cannot show that it relied on any such misrepresentations to its detriment.  Indeed, the record evidence is entirely to the contrary.  InterMetro used Cantata's Equipment to generate millions of dollars of revenue, well in excess of what InterMetro had paid for it.  Id. ¶¶ 68-69.  In fact, InterMetro has admitted that during the years 2006, 2007, and 2008, when it was using the Cantata IMGs within its network, company revenues went up each year, and totaled $75 million for the three years.  Id. ¶ 66.  InterMetro's argument that it was harmed by Cantata's (mis)representations therefore boils down to the pie-in-the-sky allegation that it would have preferred to have had more revenues during this same period.  Such rank speculation, however, cannot be used to survive summary judgment.  See Sensing, 575 F.3d at 152-53; Vega, 3 F.3d at 479.  Moreover, even if lost revenues were properly proven by InterMetro, such damages are not cognizable under the Strategic Agreement, which expressly disclaims lost profits and other "indirect, incidental, special, exemplary . . . or consequential damages." SOF ¶ 24.

**a.    InterMetro's alleged damages regarding substitute Equipment**

InterMetro stated in its counterclaim that it "has been forced at great expense to purchase

---

[8] While Cantata need not demonstrate that its Equipment was, in fact, carrier grade to prove its contract claim or refute InterMetro's counterclaims (which fail for the numerous reasons set forth above and below), to the extent that InterMetro claims the Equipment did not work, this allegation is dubious at best and appears to be refuted by InterMetro's own traffic reports.  Beginning in August 2006, InterMetro began migrating network traffic onto the Cantata IMGs. Id. ¶ 58.  InterMetro's monthly reports show that the amount of traffic flowing over the IMGs increased from August 2006 until May 2007, ranged between 20,000,000 and 30,000,000 million minutes per month between May 2007 and December 2007, and averaged more than 40,000,000 minutes per month by 2008. Id. ¶ 62.  The undisputed evidence shows that during that same two-year period, the Cantata IMGs were generating millions of dollars of revenue for InterMetro. Id. ¶¶ 65-66, 68-69.  Such revenue generation is not consistent with InterMetro's allegation that the IMGs did not work.  As John Billings, a current Cantata/Dialogic employee who helped implement the Cantata IMGs for InterMetro stated quite simply, "[c]arrier-grade means that a product is designed to work in a carrier network." Id. ¶ 45.  That is precisely what the Cantata IMGs did in this case.

substitute items of Equipment from third parties to replace Cantata's Equipment." Countercl. ¶ 8(a).  In

its interrogatory responses, InterMetro claimed that this substitute Equipment was purchased in January

2007 ($309,000), February 2007 ($1,275,000), and October 2008 ($3,338,000), for a total cost of

approximately $4,972,000. Id. ¶ 70.  The January and February 2007 purchases were allegedly made to

replace the Cantata IMGs.[9]  Yet the 2007 purchases were made while the Cantata IMGs were still under

warranty.  If this Equipment had truly been purchased by InterMetro to "replace" some portion of its

Cantata IMGs, then it defies reason that InterMetro would not have attempted to return those IMGs

pursuant to the one-year warranty, which was set to expire in May/June 2007 (one year from the date of

delivery for each IMG).  In fact, InterMetro admitted that it could have returned to Cantata those IMGs

that were not working properly, and yet InterMetro proffered no logical explanation for why it did not

do so. Id. ¶¶ 22, 93, 97-98, 105.  Such behavior is completely irrational, and thus calls into question the

proffered reasons behind InterMetro's purchases of this so-called substitute Equipment.[10]  Jon DeOng

admitted, for example, that the Nextone Equipment purchased by InterMetro in January 2007 was not

replacement Equipment at all, and he did not know why Cantata should be responsible to pay for it. Id. ¶

73.  As for the Equipment purchased in October 2008, it turns out that InterMetro needed it not because

the Cantata IMGs were not functioning, but because around this time InterMetro had many of its IMGs

seized by its co-location facility landlords for failure to pay rent. Id. ¶ 101-102.  Clearly this was not a

"detriment" that was caused in any way by representations made by Cantata regarding the IMGs; rather,

it was caused by InterMetro's own failure to pay another vendor.

### b.    InterMetro's alleged damages regarding customer credits

InterMetro also stated in its counterclaim that it "has been forced to provide substantial credits to

---

[9] It is telling, however, that InterMetro has been unable to dredge up a single invoice or purchase order relating to these alleged purchases of replacement equipment. SOF ¶ 71.

[10] Another reason to question InterMetro' allegations with respect to the alleged replacement equipment is that it listed the value of this equipment as new for purposes of damages calculations, and yet it actually purchased most of this equipment in used condition. SOF ¶ 72.  For example, the February 2007 equipment did not cost InterMetro $1,275,000, as it originally claimed, but instead only approximately $72,000. Id. ¶ 74.  Worse still, the October 2008 equipment did not cost InterMetro the $3,338,000 it initially claimed, but instead only $25,000.  Id. ¶ 75.

customers as a result of widespread shut downs of critical portions of its system." Countercl. ¶ 8(b). When asked to elaborate on these credits, InterMetro came up with a grand total of $61,227 in credits given to two customers. SOF ¶ 76. As an initial matter, it is worth noting that these so-called "credits" are orders of magnitude less than the revenues InterMetro generated from the Cantata Equipment. Compare id. ¶ 69 with id. ¶ 76. In addition, InterMetro's failure to adduce any connection at all between the alleged credits and the performance of the IMGs is fatal to its claim. The credits could have been given because of a failure in some other part of InterMetro's network, or the failure of some other piece of Equipment that had not been supplied by Cantata. Id. ¶ 77. InterMetro admitted, for example, that calls might not be processed for a variety of reasons having nothing to do with the Cantata IMGs. Id. ¶ 51. This makes sense, of course, given the complexity of InterMetro's network. Id. ¶¶ 46, 48-50. The credits could also have been due to routine changes in billing rates. Id. ¶ 77. In fact, some of the credits were given to customers who had no traffic flowing over the IMGs at the time the credits were given, making it clear that the credits were given for reasons other than problems with the IMGs. Id. ¶ 78. Without a shred of proof that the customer credits were connected to the IMGs, this alleged "detriment" is nothing more than rank speculation, and as such should not be accepted by this Court at the summary judgment stage of these proceedings.

### c.    InterMetro's alleged damages regarding lost customers

InterMetro further stated in its counterclaim that it "has lost financially significant customers." Countercl. ¶ 8(c). InterMetro puts these losses at the wildly speculative figure of $8,624,197. SOF ¶ 79. To arrive at these numbers, however, InterMetro simply took what it had hoped to gain in revenue from a particular customer and subtracted from that what it actually earned. Id. ¶ 80. Again, InterMetro completely failed to put forward evidence showing a nexus between any alleged failures in the Cantata IMGs and these "aspirational" losses in customer revenue. That would be difficult, of course, given the fact that the Cantata IMGs handled only a small percentage of the traffic for each of these customers.

InterMetro admitted that the Cantata IMGs handled a <u>maximum</u> of 20% of the traffic flowing over InterMetro's network, and in most instances they were handling <u>less than 5%</u> of that traffic. <u>Id.</u> ¶ 47. Indeed, Jon DeOng admitted at his 30(b)(6) deposition that one of the alleged customer "complaints" was from a customer that had 0% of its traffic flowing over the Cantata IMGs, and another was from a customer who allegedly complained "before a single minute of traffic flowed over the IMGs." <u>Id.</u> ¶ 80. In addition, the customers InterMetro allegedly lost due to the IMGs remained InterMetro's customers long after the isolated complaints InterMetro proffered in discovery. <u>Id.</u> ¶ 78. The suggestion that the customer complaints caused over $8 million in damages is a total fabrication.

> **d.**     **InterMetro's alleged damages regarding its ability to raise capital**

InterMetro also stated in its counterclaim that, due to the Cantata IMGs, its "ability to raise capital has been adversely impacted." Countercl. ¶ 8(d). Specifically, InterMetro stated that it lost $4,617,000 in "net lost opportunity" in 2008 alone, opportunity which would have been created had InterMetro had greater capital reserves. SOF ¶ 81. It is quite clear, however, that InterMetro's problems with raising capital had nothing whatsoever to do with, and existed well before its purchase of, the Cantata IMGs. <u>Id.</u> ¶ 82. The absurdity of InterMetro's position is underscored by the fact that it did not even have the capital to pay for the IMGs themselves. Indeed, InterMetro admitted that it went with Cantata's IMGs (as opposed to gateways from another vendor) in part because Cantata was the only vendor willing to provide InterMetro with a purchase plan that did not require InterMetro to put down money up front. <u>Id.</u> ¶ 31. Moreover, InterMetro's own material offered in support of this claim (an alleged package to prospective investors), boasts that the Cantata Equipment is "state-of-the-art," and that the revenue share deal with Cantata decreased InterMetro's capital expenditures for 2006. <u>Id.</u> ¶ 44.

> **e.**     **InterMetro's alleged damages regarding its failed network expansion**

InterMetro finally contends that it has been damaged because it expanded its network at great cost, only to have to scale back again when the Cantata IMGs were (allegedly) found not to work as

InterMetro had hoped. Id. ¶ 83.  InterMetro contends that the cost of this "expansion, maintenance at a loss, and then retreat" totals approximately $7,385,127. Id.  This contention is undercut, however, by the fact that InterMetro's expansion was not predicated on the May 2, 2006 deal with Cantata.  InterMetro's corporate witnesses admitted that the company began expanding its network well prior to the Cantata deal or even the contemplation of the deal.  For example, Charles Rice admitted that by the time of the May 2, 2006 deal, InterMetro had already expanded into the key markets where the IMGs were ultimately placed. Id. ¶ 84.  And Jon DeOng admitted that InterMetro would have incurred the $7.38 million in network "build-out" costs whether or not it had purchased the Cantata Equipment. Id. ¶ 85.  Furthermore, to the extent InterMetro actually had to "retreat" from its expansion plans, that is likely due less to the performance of the IMGs than to the fact that many of InterMetro's IMGs were seized by co-location landlords for failure to pay rent, and thus InterMetro had to shut down these locations. Id. ¶¶ 101-102.  This is precisely what happened with at least the Chicago, Atlanta, Miami locations, all of which InterMetro was forced to shut down in late 2008 and early 2009. Id.  InterMetro's chief technology officer even admitted that but for the forced shut downs, InterMetro would still be operating in those locations with the Cantata Equipment. Id. ¶ 102.

In sum, InterMetro has not put forward a shred of competent evidence to suggest that any of its alleged damages – i.e., its alleged "detrimental" reliance – had anything to do with representations made by Cantata concerning its IMGs.  Rather, these purported losses appear to be attributable to nothing more than manipulation of revenue and Equipment cost figures, poor business judgment, and other failures on InterMetro's part.  InterMetro's counterclaims cannot survive on such a thin reed.

> **3.     Even assuming InterMetro can prove reliance on and damage from the alleged misrepresentations of Cantata, InterMetro cannot show that such reliance was remotely reasonable.**

A party cannot simply claim a fraudulent misrepresentation to get out of a voluntarily signed, fully negotiated, and fully integrated contract.  That is why courts must scrutinize whether the claiming

party <u>reasonably</u> relied on the alleged misrepresentations – in other words, whether the party's reasons for claiming fraudulent misrepresentation actually make some modicum of sense. <u>Rodi</u>, 532 F.3d at 15 (citing <u>Masingill</u>, 449 Mass. at 540-41). Here, the record indicates that InterMetro's alleged reliance on the misrepresentations allegedly made by Cantata is not just unreasonable; it is utterly implausible.

### a.    InterMetro's prior use of test IMGs

As an initial matter, it is difficult to imagine that InterMetro reasonably relied on any false representation made by Cantata since Cantata supplied InterMetro with IMGs for testing more than four months <u>prior</u> to the execution of the May 2, 2006 Strategic Agreement. Indeed, as early as December 2005, InterMetro had at least two "test" Cantata IMGs at its disposal, to see if they could be used in InterMetro's network. SOF ¶ 87. InterMetro unequivocally stated that these test IMGs were "in our labs and running" before May 2006. <u>Id.</u> ¶ 88. One can only assume, therefore, that the results of the tests were positive, as there is otherwise no reason that InterMetro would have subsequently ordered 30 identical IMGs pursuant to the Strategic Agreement. Furthermore, had any of the IMGs purchased as part of the May 2, 2006 deal been different in functionality from the test IMGs, InterMetro would have been able to ascertain this promptly. <u>Id.</u> ¶ 89.

Thus, whether or not Cantata actually represented its IMGs as "carrier grade" to InterMetro (and there is absolutely no evidence that it did), InterMetro was in a position to assess, well prior to signing the Strategic Agreement, whether that representation was in fact accurate. Moreover, all of the evidence in InterMetro's public filings suggests that the equipment was state of the art, and part of a carrier-quality network that was fully functional. <u>Id.</u> ¶¶ 43-44, 64. If this were not the case, InterMetro had a warranty provision which permitted the return of the Equipment. Therefore, for InterMetro to claim now that it reasonably relied on Cantata's alleged misrepresentations is nothing more than a disingenuous excuse for InterMetro's breach of contract.

### b.    InterMetro's usage of and profits from the Cantata IMGs

InterMetro's alleged reliance on Cantata's representations to its detriment is not reasonable for an additional reason, namely, the existence of uncontroverted evidence showing that the Cantata IMGs passed millions of minutes of traffic, and that InterMetro continued to use them for over three years following their purchase. InterMetro has admitted that between the time it began to migrate network traffic onto the IMGs in August 2006 and August 2009, the IMGs passed approximately 810,000,000 minutes of traffic, which generated a minimum of $2.3 million (and possibly as much as $4.05 million) in revenue for InterMetro, far in excess of the actual purchase price of the IMGs or the payments made to Cantata. Id. ¶ 69. For InterMetro to belatedly suggest in response to this litigation that it used the Equipment to its detriment is illogical, particularly in light of the fact that throughout that entire time InterMetro made SEC statements and provided presentations to potential investors extolling the virtues of the IMGs. Id. ¶¶ 43-44, 64. If the Cantata IMGs did not work, and if they caused InterMetro such great harm, then it is completely unreasonable for InterMetro to have continued using them in the face of a warranty provision that permitted their return.

Equally unavailing is InterMetro's suggestion that it had no choice but to use the Cantata Equipment because things would have been "even worse" without it. Id. ¶ 79. First, the notion that InterMetro would have been worse off without the Cantata Equipment logically suggests that InterMetro was better off with it. Second, the notion that InterMetro had no choice but to retain allegedly faulty Equipment flies in the face of the warranty provisions of the Strategic Agreement, as discussed below, and the fact that InterMetro paid nothing up front for the Equipment. It is also illogical for InterMetro to enter into a Strategic Agreement, which contained warranty protections if the Equipment did not work, if (by its own admission) InterMetro was too cash-strapped to ever return the Equipment, regardless of how it worked.

### c.     InterMetro's failure to take advantage of its warranty rights

It is undisputed that Section 16 of the Strategic Agreement contained a one-year warranty on all

new Equipment. Id. ¶¶ 21-23.  Indeed, InterMetro admitted that it was aware of the warranty and did not return the IMGs. Id. ¶¶ 22, 98.  Pursuant to this warranty provision, had the Cantata IMGs not operated "in substantial conformance with Cantata's standard published documentation[11] accompanying the product" (which is, of course, the crux of InterMetro's fraudulent misrepresentation claim), then InterMetro had the right to return the IMGs for a full refund or replacement. Id. ¶ 21.

Nevertheless, InterMetro now insists that the IMGs did not work properly.  For example, InterMetro stated that it put its "best customer" at risk with this allegedly "terrible" Equipment, that the IMGs were the "lynchpin" of its network, and that it "quit using [the Cantata IMGs] as much as we could in 2007." Id. ¶ 96.  InterMetro also claims that it knew the IMGs were not "carrier grade" by the fall of 2006. Id. ¶ 97.  Yet if any of these allegations are true (and InterMetro has not put forward a scintilla of evidence that they are), then it is patently unreasonable – indeed, inexplicable – that InterMetro did not take advantage of the warranty provision and return the Equipment.  If the IMGs were indeed not carrier grade, or even if InterMetro perceived them as insufficient, then InterMetro's own testimony establishes that it reached this conclusion well within the one-year warranty period.  The complete failure to act on its warranty rights, then, is fatal to InterMetro's claim for fraudulent misrepresentation.  InterMetro's position is particularly unreasonable in light of the fact that it admitted it was aware of the warranty provision, and also admitted that when it had problems with a specific component of the IMGs, Cantata would promptly provide a replacement free of charge (as it did in November 2006 when it replaced the motherboards of all 30 IMGs). Id. ¶¶ 90-93.

### 4.    Absent a valid misrepresentation claim, InterMetro's other counterclaims against Cantata necessarily must fail.

InterMetro's breach of contract and breach of warranty counterclaims (Counts II and III) fail for the same reasons discussed above.  The claim that Cantata "fail[ed] to provide equipment and services"

---

[11] It is noteworthy, however, that InterMetro has not identified one product specification which the Cantata IMGs failed to meet.

that were "in conformity with the parties' agreement" and that "conformed with warranties expressly made and with the implied warranties of merchantability and fitness for particular purpose," Countercl. ¶¶ 12, 14, is belied by the fact that the Cantata IMGs actually worked, that InterMetro derived significant revenue from them, and that even if none of this were true, InterMetro failed to take advantage of its warranty rights under the Strategic Agreement. Additionally, all such implied warranties were expressly disclaimed in the Strategic Agreement. SOF ¶ 23.

InterMetro's Chapter 93A counterclaim (Count IV) also must fail, because "to recover under Chapter 93A based on [a] claim of fraudulent misrepresentation," the claiming party "must prove reasonable reliance." Rodi, 532 F.3d at 19 (and citations therein). The unreasonableness of InterMetro's alleged reliance in this case undermines as a matter of law any suggestion that Cantata engaged in unfair or deceptive practices in its dealings with InterMetro.

InterMetro's quantum meruit claim (Count V) is similarly unavailing. This claim is predicated on the suggestion that Cantata received something for nothing as part of the Strategic Agreement – *i.e.*, that Cantata's IMGs were not "carrier grade" and thus were useless to InterMetro, yet InterMetro provided "valuable services and assistance to Cantata's IT personnel with respect to the systems that had been supplied by Cantata to InterMetro." Countercl. ¶ 19. Again, there is not an iota of evidence proffered by InterMetro to establish this allegation. To the contrary, InterMetro believed that the Cantata Equipment was crucial to their business, and as such, could not return the Equipment even when Cantata sought to compel its return in 2009. DeOng Affidavit, Docket No. 37, at ¶¶ 10-11. Moreover, the Equipment was profitable, as evidenced by the multiple millions of dollars of revenue that InterMetro received from the Equipment's use in InterMetro's network. Even if Cantata learned a bit about the IMGs in the process of building enhancements in its software, which InterMetro has not proven, some of these enhancements were requested by InterMetro to suit its own needs. If Cantata benefited from this as a byproduct of the support services it provided to InterMetro, that alone cannot be

used to prop up InterMetro's quantum meruit claim.

C.   **SUMMARY JUDGMENT IN FAVOR OF DIALOGIC ON INTERMETRO'S THIRD-PARTY CLAIMS IS WARRANTED BASED ON INTERMETRO'S ADMISSIONS.**

InterMetro's third-party claims against Dialogic, which are for tortious interference with contractual relations (Count I) and violation of Chapter 93A (Count II), are predicated on InterMetro's allegation that Dialogic "caused Cantata to fail to honor its obligations under its Agreement with InterMetro by, inter alia, withdrawing the necessary support required by Cantata to remedy defects in the software and equipment it provided to InterMetro." 3PC ¶ 5. These third-party claims must fail because (1) Dialogic only acquired Cantata in October of 2007, well over one year after the May 2, 2006 Strategic Agreement between Cantata and InterMetro had been entered into; (2) the one-year warranty period on the Equipment and the one-year support plan expired, at the latest, in June 2007, prior to Dialogic's acquisition of Cantata; and (3) by the time of Dialogic's acquisition of Cantata, InterMetro had yet to pay for any Equipment or support services, and therefore neither Cantata nor Dialogic were obligated to provide continued support.

Jon DeOng conceded at his 30(b)(6) deposition that InterMetro could not have relied on any Dialogic materials or representations prior to purchasing the 30 IMGs from Cantata in 2006 because Dialogic had not acquired Cantata, and as such, all materials bearing the Dialogic name necessarily post-date the Strategic Agreement by more than a year. SOF ¶ 109. DeOng further admitted that by the time Dialogic acquired Cantata, the one-year support plan that had been provided by Cantata to InterMetro pursuant to the Strategic Agreement had already expired. Id. ¶ 110. Thus, to the extent any technical support was provided to InterMetro subsequent to June 2007, it was not pursuant to any contract between Cantata and InterMetro, let alone any contract between Dialogic and InterMetro (which contract of course did not exist). Indeed, DeOng admitted that Dialogic never had any obligation – legal or otherwise – to provide InterMetro with such support. Id. ¶ 111. And he further conceded that by the time Dialogic acquired Cantata in October 2007, InterMetro had paid for neither the Cantata

Equipment nor the Cantata support services. Id. ¶ 112. That begs the question of what obligation Cantata could possibly have still had to InterMetro at the time of Cantata's acquisition by Dialogic. Moreover, Dialogic could not have interfered with a non-existent obligation simply by refusing to provide support which it did not have an obligation to provide, and for which InterMetro had failed to pay. As such, it is apparent that InterMetro's third-party claims against Dialogic are completely frivolous.[12]

This very fact was pointed out by counsel for Cantata and Dialogic in a letter sent to InterMetro's counsel on September 30, 2008, pursuant to Fed. R. Civ. P. 11 and Mass. Gen. Laws c. 231 § 6F. In relevant part, the letter stated:

> As InterMetro [is] aware, and was reminded on several occasions prior to the institution of this litigation, Dialogic was never a party to the contractual or support relationship between Cantata and InterMetro. Indeed, it is undisputed that the contractual relationship was between InterMetro and Cantata, which remains a separate legal entity from Dialogic. (See InterMetro's Answer, ¶¶ 6, 28, 36, 37, and 38.) Furthermore, any dispute concerning the discontinuation of support was between InterMetro and Cantata, which was providing and then discontinued support to InterMetro for non-payment. (Id.)

SOF ¶ 114 (citations to Answer in original). The letter further requested that "[i]f InterMetro has a good faith basis for the allegations and claims in the third-party Complaint, Dialogic requests that the supporting evidence be articulated immediately." Id. at 115.

Now, well over a year after receiving the Rule 11 letter, and well after the conclusion of fact

---

[12] Furthermore, even if InterMetro could demonstrate a factual basis for its chapter 93A claim against Dialogic, which it cannot, it is also unable to meet the statutory requirement that the offending conduct occurred "primarily or substantially within the Commonwealth." In conducting this inquiry, the First Circuit views a number of factors, including (1) where defendant committed the unfair/deceptive act, (2) where plaintiff received or acted on the wrongful conduct, and (3) where plaintiff sustained losses caused by the wrongful conduct. Uncle Henry's Inc. v. Plaut Consulting Co., 399 F.3d 33, 44-45 (1st Cir. 2005). In this case, even if Dialogic, an out-of-state corporation, cut off support services, InterMetro would have received that allegedly wrongful conduct in California and sustained the losses there. As such, "the center of gravity of the circumstances that give rise to the claim" is primarily and substantially outside of the Commonwealth, and therefore InterMetro cannot assert a claim under chapter 93A. Kuwaiti Danish Computer Corp. v. Digital Equip. Co., 438 Mass. 459, 473 (2003). Finally, even if InterMetro could show that it had a contract for support, and that termination by Dialogic for non-payment was a breach, those facts would be insufficient to state a 93A violation. See Commercial Union Ins. Co. v. Seven Provinces Ins. Co., 217 F.3d 33, 40 (1st Cir. 2000) ("A mere breach of contract does not constitute an unfair or deceptive trade practice under 93A unless it rises to the level of commercial extortion or a similar degree of culpable conduct." (internal citations and quotation marks omitted)).

discovery, it is evident that InterMetro has no such supporting evidence, which fact its corporate representative conceded at InterMetro's 30(b)(6) deposition. Id. at 108-112. InterMetro's "evidence" of interference by Dialogic in the contract between InterMetro and Cantata rests on the flawed assumption that Cantata continued to have obligations to InterMetro under the Strategic Agreement even after InterMetro had failed to make monthly payments for Cantata's Equipment and support services, and after the expiry of the one-year support plan set forth in the Strategic Agreement. Id. ¶ 113. In actuality, by the time Dialogic acquired Cantata, the only remaining obligations under the Strategic Agreement were InterMetro's, not Cantata's. Thus, summary judgment is warranted in favor of Dialogic on InterMetro's third-party claims.

## CONCLUSION

For the foregoing reasons, Cantata requests that summary judgment enter in its favor on all counts of its complaint, including the award of its costs and attorneys' fees pursuant to the § 18(k) of the Strategic Agreement, as well as statutory interest. Cantata and Dialogic further request that summary judgment enter in their favor on all counts of InterMetro's counterclaims and third-party claims. Finally, pursuant to Fed. R. Civ. P. 11(c) and Mass. Gen. Laws c. 231 § 6F, Dialogic requests that the Court award it the attorneys' fees and costs Dialogic incurred to defend against InterMetro's frivolous third-party claims.

Respectfully submitted,
CANTATA TECHNOLOGY, INC. and
DIALOGIC CORPORATION,
By their attorneys,

/s/ Windy R. Catino
Barbara L. Moore (BBO# 352780)
Windy Rosebush Catino (BBO# 636962)
Thomas H. Wintner (BBO# 667329)
EDWARDS ANGELL PALMER & DODGE LLP
111 Huntington Avenue
Boston, MA 02199
Dated: December 30, 2009                    (617) 239-0100; (617) 227-4420 (facsimile)

## Local Rule 7.1 Certification

The undersigned hereby certifies that counsel for Cantata and Dialogic has conferred with counsel for InterMetro and attempted in good faith to resolve the issues presented in this Motion for Summary Judgment, but was unable to do so.

/s/ Windy R. Catino
Windy R. Catino


## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 30, 2009.

/s/ Windy R. Catino
Windy R. Catino